

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| SIRIUS XM RADIO INC., | |
| Plaintiff, | Case No. _____ |
| v. | |
| SOUNDEXCHANGE, INC. and AMERICAN ASSOCIATION OF INDEPENDENT MUSIC, | **COMPLAINT** |
| Defendants. | **JURY TRIAL DEMANDED** |

Plaintiff, Sirius XM Radio Inc. ("Sirius XM"), by and through its undersigned attorneys, alleges as follows:

## I.   BACKGROUND

1.      Sirius XM brings this antitrust and tortious interference action to halt the unlawful conduct of the recording industry's copyright collective, Defendant SoundExchange, Inc., Defendant the Association of Independent Music ("A2IM") and various other record industry trade associations.  These organizations, acting in concert with one another and with their individual recording company members, have erected an industry-wide conspiracy to boycott and tortiously interfere with Sirius XM's efforts to secure through the workings of a competitive market copyright rights critical to the conduct of its business.  As a result of this concerted refusal to deal, the Defendants and other industry trade organizations, in concert with numerous individual record labels, have eliminated price competition in, among others, the

market for digital transmissions of sound recordings licensable under the statutory licensing provisions of Section 114 of the Copyright Act of 1976.  The purpose and effect of this unlawful conduct has been to allow SoundExchange, acting on behalf of the entire record industry, to monopolize the licensing of these rights in direct contravention of the licensing framework carefully constructed by Congress.  That framework expressly prescribes that any such collective licensing of such rights must be *non-exclusive* in nature so as not to interfere in individual licensing transactions between individual copyright owners and users such as Sirius XM.  In furtherance of this conspiracy Defendants and others have coerced record companies to refrain from entering into competitive market licenses, used implicit and explicit threats to enforce compliance, misled record companies as to their economic interests, and even encouraged some record companies to terminate license agreements they had already concluded with Sirius XM.

2.      As described more fully throughout this Complaint, Sirius XM makes significant uses of copyrighted sound recordings in its satellite radio and other businesses. Certain of those uses involve digital transmissions of sound recordings as defined by copyright law (sometimes referred to herein as sound recording performance rights).  The law establishes a "statutory license" for the benefit of services like Sirius XM covering certain digital performances of copyrighted sound recordings.  The relevant statute establishes three mechanisms for services to acquire the sound recording performance rights that they need.  The favored mechanism is by direct dealings in a competitive market with the owners of those rights – typically record companies.  In recognition that such direct dealings may, in certain cases, not be effective in clearing all necessary rights in a timely manner, the law allows sound recording copyright owners to designate "common agents on a nonexclusive basis to negotiate, agree to,

pay, or receive payments." 17 U.S.C. § 114(e)(1). If negotiations with the common agent fail, the last statutory resort is a rate-setting proceeding before the Copyright Royalty Board. SoundExchange has emerged as the recording industry's "common agent."

3.      For a variety of business reasons, Sirius XM has sought to negotiate terms of sound recording performance rights licenses, among other copyright rights incident to conducting its business, through direct negotiation with individual recorded music companies. Direct licensing of the sort proposed by Sirius XM offers substantial benefits to the record companies in comparison to their reliance on SoundExchange to distribute royalties pursuant to statutory licenses it negotiates or litigates over on the record industry's behalf. These include faster and more transparent royalty reporting and payment, avoidance of SoundExchange administrative costs, and the ability to grant broader rights to Sirius XM than SoundExchange legally is able to, thereby affording the record company's artists and recordings both wider exposure and access to new media and promotions run by Sirius XM.

4.      Alarmed at the prospect that record companies, acting in their individual economic interests, would pursue direct licensing with Sirius XM, and that such licensing would inject competition into the licensing of copyrights used by Sirius XM, Defendants and their co-conspirators determined to suppress that competition. Their orchestrated response has resulted in a concerted refusal to deal by numerous record companies approached by Sirius XM to negotiate direct licenses. The unlawful purpose and effect of this boycott has been to force Sirius XM into a single avenue for procuring the rights it needs: dealing exclusively with SoundExchange, as the record industry's collective licensing agent.

5.      The boycott has been implemented between and among the Defendants and other trade associations, who have conscripted into the scheme otherwise competing record

companies whose representatives sit on the Boards of Directors of the Defendants and other complicit industry trade groups. Through this unlawful scheme, numerous record companies have been induced, against their individual economic self-interest, not to enter into negotiations with Sirius XM in favor of casting their collective licensing lot with SoundExchange. The boycott is being enforced by coercion of potential defectors and by acts of tortious interference with signed direct licenses through inducing record company signatories to renege on them. The loyalty of the participants in this boycott is being rewarded by the extraordinarily high fee demands made of Sirius XM by SoundExchange for ongoing statutory licenses, both at the bargaining table and in the formal rate proposal that has now been submitted on the record industry's behalf before the Copyright Royalty Board in a proceeding to determine statutory fees for the 2013-2017 period.

6.      Numerous record companies that otherwise were prepared to enter into negotiations with Sirius XM and potentially sign direct licenses have, by agreement with the Defendant associations and other record companies, refrained from doing so. Their communicated explanations include: that Defendant "**A2IM is opposed to it**"; that membership in A2IM and another industry trade association **"prevent a direct license"**; that the Recording Industry Association of America ("RIAA"), a national professional trade association composed of major and other record labels and distributors with two senior executives on the SoundExchange Board, had **"asked everyone to hold off"**; and that a major label distributing an independent record label had "advis[ed] **against signing directly with SiriusXM."**

7.      Illustrative of the unlawful efforts undertaken by Defendants and others to cause record companies that signed direct licenses to back out of them is Sirius XM's experience with a record company that has asked to be released from its executed direct license agreement

because of pressure placed upon it by a Board member of SoundExchange, who, "**per conversations with A2IM and other folks beyond SoundExchange …[,] stand their ground about wanting us to opt out.**"

8.    This is not a case simply of parallel conduct on the part of record companies in furtherance of their individual economic interests.  Acting individually, record labels would have no interest in limiting the exposure of their artists on the platform provided by Sirius XM. Indeed, in a competitive market, some independent labels would likely pay Sirius XM to increase the exposure of their recordings in order to promote their sale.  Others would agree to lower royalty fees in order to foster greater play and increased market share.  Others would negotiate competitive direct licenses in order to obtain other benefits that could be offered as a part of these direct licenses.

9.    Through their unlawful collusion, SoundExchange, A2IM and their co-conspirators have stifled these pro-competitive outcomes.  The unlawful conduct by SoundExchange, A2IM and others has significantly raised Sirius XM's costs, threatened the viability of its business model in a highly competitive and technologically volatile sector of the entertainment market, and risked diminishing the public's access to music, through fewer media.

10.    As a result of this concerted refusal to deal, the Defendants, in concert with numerous individual record companies, have eliminated price competition in the market for digital performance rights in sound recordings licensable under the statutory licensing provisions of Section 114 of the Copyright Act, 17 U.S.C. § 114, and in other markets.  Not only do SoundExchange's unlawful actions violate the federal antitrust laws and New York tort law; they are contrary to the very statute by which Congress provided for the licensing of sound recording performance rights to digital music services such as Sirius XM.  The licensing framework

established by that statute favors, and seeks to preserve, a competitive market in direct licenses between digital music services and record companies and expressly requires any collective licensing to be *non-exclusive*, so as not to interfere with that competitive market. The setting of rates through SoundExchange as an aggregator and the Copyright Royalty Board as a rate-making body is the alternative, second-best scenario described and authorized in Section 114 of the Copyright Act. Direct arm's-length transactions between interested parties in a free market is always preferable to the imperfect task of setting a regulatory rate. Defendants and their unnamed co-conspirators have, quite simply, attempted to eliminate entirely the first and preferred method of sound recording performance rights licensing under Section 114.

11.    Lest Defendants and their co-conspirators continue to succeed in stifling price competition across the entire market for licensing performance and other copyright rights in sound recordings, whether pursuant to statutory licenses or otherwise, Defendants' unlawful conduct should be permanently enjoined with such other and further relief as is necessary to dissipate the effects of that conduct and restore free competition.

## II.   JURISDICTION AND VENUE

12.    This action arises under Sections 1 and 2 of the Sherman Act, 15 U.S.C. §§ 1 and 2, and Sections 4 and 16 of the Clayton Act, 15 U.S.C. §§ 15 and 26, to enjoin Defendants' continuing violations of the antitrust and other laws, which have caused and continue to cause injury to competition, consumers and Sirius XM, and to recover damages and costs of suit, including reasonable attorneys' fees, against Defendants.

13.    Defendants' acts, as described herein, affect interstate commerce in the licensing of performance rights in copyrighted sound recordings available under Section 114 of the Copyright Act across the United States.

14.     This Court has subject matter jurisdiction over the federal antitrust law claims alleged herein under 15 U.S.C. §§ 15 and 26 and 28 U.S.C. §§ 1331, 1337, 2201, and 2202.

15.     This Court has subject matter jurisdiction over the state law tortious interference claims alleged herein under 28 U.S.C. § 1367.

16.     Venue is proper before this Court under the provisions of 15 U.S.C. § 22 and 28 U.S.C. § 1391 because Defendants have resided in, transacted business in, or were found in this District, and because a substantial part of the events giving rise to the violations alleged occurred in this District, and a substantial portion of the affected interstate trade and commerce described in this Complaint, has been carried out in this District.

17.     This Court has personal jurisdiction over Defendants because, *inter alia,* Defendants: (i) have transacted business throughout the United States, including in this District; (ii) have substantial contacts within the United States, including in this District; and/or (iii) were engaged in an illegal antitrust conspiracy that was directed at and had the intended effect of causing injury to persons residing in, located in, or doing business throughout the United States, including in this District.

### III.   THE PARTIES

18.     Sirius XM is a corporation organized and existing under the laws of the State of Delaware, with its principal place of business located at 1221 Avenue of the Americas, 36th Floor, New York, New York, 10020.  Sirius XM also has offices in Washington, D.C. and studio facilities located in additional cities.  Sirius XM is engaged in, *inter alia*, the operation of satellite digital audio radio service and Internet webcasting throughout the United States.  As one of the largest subscription media companies nationwide, Sirius XM broadcasts more than 135 channels of commercial-free music, sports, live news, talk, comedy, entertainment, traffic, and weather to more than 21 million subscribers.

19.    Defendant SoundExchange, Inc. ("SoundExchange"), originally organized as an arm of the RIAA, is a nonprofit organization representing recorded music companies and artists that is organized and exists under the laws of the State of Delaware.  SoundExchange maintains its headquarters at 1121 Fourteenth Street NW, Suite 700, Washington, District of Columbia, 20005.  Sound Exchange's Board of Directors comprises: representatives of each of the four major record companies; representatives of independent record companies; both the CEO and General Counsel of the RIAA; the President of Defendant American Association of Independent Music; the Executive Director of the American Federation of Television and Radio Artists ("AFTRA"); a representative of the American Federation of Musicians ("AFM"); as well as representatives of other record industry trade organizations and advisors.   Each of the constituent industry representatives represents separate and independent entities that, in turn, represent companies or persons having separate and independent economic interests with separate centers of decision-making.  On behalf of its recording artist and sound recording copyright owner members, SoundExchange collects and distributes royalties for the performance of sound recordings over various media, including satellite radio, internet radio, business establishment services, and cable and satellite television networks.  Some 12,700 SoundExchange members comprise record labels and artists with copyright ownership over their own recordings.  In its role as distributor of statutory royalties under §§ 112 and 114 of the Copyright Act, SoundExchange represents the interests of non-members as well -- in total, maintaining accounts for more than 20,000 rights owners and more than 45,000 artists.  Since its inception, SoundExchange has collected some $900 million in statutory royalties.

20.    Defendant the American Association of Independent Music ("A2IM") is a national nonprofit professional trade association composed of hundreds of independent record

labels said to represent some 30% or more of U.S. sound recording sales. A2IM's principal place of business located at 853 Broadway, Suite 1406, New York, New York, 10003. A2IM acts by, through, and on behalf of, its separate and independent record label members, each of which has separate and independent economic interests and separate centers of decision-making. An A2IM representative (currently its president, Rich Bengloff) sits on the SoundExchange board of directors.

21.     Various other persons, firms, and corporations, including individual record companies, have participated as unnamed co-conspirators with Defendants in the violations alleged herein, have aided, abetted, and performed acts and made statements confirming and in furtherance of the conspiracy, and have engaged in unlawful and tortious conduct by coercing record labels into not dealing directly with Sirius XM and by demanding that record labels rescind binding license agreements with Sirius XM. The goal of the conspiracy is to render SoundExchange the exclusive licensor of all sound recording performance rights for satellite radio (and other media) and thereby to extract monopoly fees for the use of sound recordings by Sirius XM and others.

## IV.     SIRIUS XM'S BUSINESS AND USE OF MUSIC

22.     In July, 2008, Sirius Satellite Radio Inc. and XM Satellite Radio Holdings Inc. merged to form Sirius XM. Sirius XM's predecessors pioneered the delivery of music and other programming via satellite radio at great risk and expense and with the aid of innovative technology.

23.     Sirius XM broadcasts music and non-music content on a subscription fee basis. Its services consist primarily of satellite-delivered programming to receivers in vehicles and homes; the company also operates an Internet streaming service, a business establishment service (offering music channels for performance of background music in retail establishments), and a

cable/satellite television music service. Some 71 of the company's more than 135 channels are devoted to a wide array of commercial-free music content. Roughly half of Sirius XM's programming is not based on the performance of sound recordings, including the well-known Howard Stern show, numerous news, political and other talk-radio channels, and extensive college and professional sports programming.

24.      Sirius XM's predecessor companies spent years operating in an extremely difficult business environment in which they suffered losses totaling in the billions of dollars. The merger has now allowed for the attainment of certain efficiencies that may allow the company to begin to recoup its massive investments in pioneering satellite radio and develop further innovations in what remains a challenging competitive environment. However, Sirius XM is far from recovering the enormous capital investment and is just at the point where it is beginning to earn a small profit on its investment. The company also faces competition from traditional radio (which pays no sound recording royalties) and new services such as Internet-delivered content using the latest wireless transmission systems.

25.      A major ongoing constraint on Sirius XM's ability to compete is its sound recording performance royalty obligation pursuant to the provisions of copyright law described below. Sound recording license fees are a major component of Sirius XM's cost structure. In 2011. Sirius XM paid nearly $200 million in statutory royalties to the record industry on account of this obligation – making it by far the largest payor of statutory royalties. Sirius XM's direct license initiative reflects in significant part the company's effort to engage the market to control this cost and enhance its ability to compete. The unlawful actions of SoundExchange and its co-conspirators in cutting off the possibility of competitive, free-market negotiation with individual record companies have injured Sirius XM and other potential licensees of sound recordings,

poses a grave threat to Sirius XM's business model, and causes it irreparable injury every day it continues.

## V.    THE RELEVANT COPYRIGHT LAW FRAMEWORK

26.    In 1995, breaking with long tradition, Congress for the first time afforded record companies and their artists the right to be compensated under U.S. copyright law for certain public performances of their sound recordings: those performed by means of a digital audio transmission. *See* 17 U.S.C. § 106(6).  Congress at the same time established a compulsory licensing mechanism, available to users such as Sirius XM, to obtain a "statutory" license to cover prescribed performances of sound recordings.  The royalty rate for uses falling within the statutory license can be set by negotiations between the user and individual copyright owners or, in the circumstances described below, via collective negotiations.  Absent agreement, royalty rates are set by an impartial tribunal of copyright judges acting as the Copyright Royalty Board ("CRB").  *See* 17 U.S.C. § 114(f).

27.    A limited antitrust exemption in the Copyright Act allows otherwise competing record companies to negotiate collectively and, if necessary, litigate collectively before the CRB the terms for these statutory licenses.  *See* 17 U.S.C. § 114(e).  The exemption also permits the designation of a common agent to perform these functions.  SoundExchange was organized by the record industry to fulfill that role.

28.    The joint negotiating and litigating authority permitted by § 114(e) is, however, expressly limited in at least two key respects:  First, it is *non-exclusive* in nature, meaning that individual record companies and their artists remain free to deal directly with services such as Sirius XM to license uses of their music.  Second, the antitrust exemption is limited to covering negotiations over the terms of *statutory* licenses.  The exemption does not authorize collective action relating to the licensing of copyright rights that fall *outside* of the purview of the

11

statutory license.  As described herein, the acts of Defendants and their co-conspirators have transgressed both of these important limitations.

## VI.    THE CURRENT STATUTORY LICENSE RATES AND THE RECORD INDUSTRY'S ONGOING EFFORT TO DRAMATICALLY RAISE THEM

29.    The current rates and terms for Sirius XM's statutory license were set in a rate-setting proceeding before the CRB (affirmed by the DC Circuit after an appeal by the record industry) that provides for statutory license rates beginning at 6% of stipulated Sirius XM revenues as of 2007, reaching 8% of such revenues as of the last year of the license, 2012.  The record industry was bitterly disappointed in that outcome, and, through SoundExchange, has communicated to Sirius XM its intention to seek dramatically higher statutory license fees beginning in 2013.  Indeed, in the recently-commenced CRB proceeding covering the 2013-2017 period, SoundExchange has sought rates between 13% and 20% of Sirius XM's gross revenues.

## VII.    SIRIUS XM'S DIRECT LICENSE EFFORTS

### A.    Sirius XM's Direct Licensing Initiative

30.    During the current license term, reflecting the challenging economic environment in which the company is operating, Sirius XM has sought to reduce its costs by, among other measures, negotiating more favorable contracts with many of its key subscriber draws, including Howard Stern, the National Football League, and Oprah Winfrey.  As part of this effort, Sirius XM has sought to control the cost of its music programming by negotiating royalty rates with individual record labels.  This interest was further spurred by the extraordinary increases in statutory fees that the record industry, through SoundExchange, advised they were seeking as of 2013.  Direct licensing was viewed as furthering other corporate purposes as well, such as the company's interest in entering into a single license covering its satellite, Internet, business establishment, and cable-television music services, as well as being able to offer enhanced

functionality and programming, such as on-demand and interactive capabilities. Certain of these rights, for example, to feature artist-specific programs and to enable users to listen to and store tracks for later on-demand listening, exceed those available to Sirius XM under a Section 114 statutory license and can only be obtained through direct dealings with individual record companies.

31.     An important provision governing the current statutory license entitles Sirius XM to reduce its SoundExchange statutory royalty obligation to the extent direct licenses are entered into between Sirius XM and individual record companies. *See* 37 C.F.R. § 382.11. This provision ensures that Sirius XM does not pay twice for performances covered by such direct licenses: once directly to the individual record company, and once again through otherwise unreduced payments to SoundExchange. This pro-competitive term of the existing statutory license provides Sirius XM with the incentive to seek licensing alternatives and affords individual record companies the opportunity to compete against one another for airplay on Sirius XM and potentially earn enhanced royalties. In short, this statutory term made feasible Sirius XM's direct license initiative.

32.     Working with a leading provider of high-volume license administration services with deep expertise in the music industry and with similar direct license programs, Sirius XM began developing in 2010 a comprehensive direct license proposal for record companies. The direct licenses subsequently offered by Sirius XM feature the following pro-competitive elements, among others, that serve economically to benefit participating record labels in ways that licensing through SoundExchange does not.

- *First*, in contrast to the limited rights SoundExchange can, by law, bargain over, confer, and administer, under Sirius XM's direct license, the company obtains the rights needed for all its platforms and the range of its desired uses, without regard for

the technical limits of the statutory license. In turn, participating record companies receive royalty payments under a single license.

- *Second*, the Sirius XM direct license provides for more timely payments to rights holders, on a quarterly basis, than does SoundExchange. SoundExchange amasses large amounts of undistributed royalties every year, has difficulty identifying the rights holders entitled to distributions, and commonly makes delayed (often years late) royalty payments for sound recording usage. SoundExchange itself has admitted that its royalty processing and distribution system is in "crisis" mode.

- *Third*, the royalty range of the direct licenses is from 5% to 7% of gross revenues (with each copyright owner taking its *pro rata* share[1]). While this is slightly below the 2012 statutory rate of 8%, the difference is narrowed by the fact that, unlike SoundExchange, Sirius XM takes no administrative cut from the royalties owed. SoundExchange, by contrast, retains a significant portion of the royalties it collects for music rights holders in administrative costs, including the enormous costs of license fee litigation before the CRB, which result in lowered royalty payments to labels. The direct licenses also offer a chance for participating record companies to earn *more* royalty income and gain greater exposure for their catalogs of works than under the statutory license – the essence of competition.

- *Fourth*, Sirius XM's direct licenses allow direct accounting and reporting of royalties, providing greater transparency as to tracking compensable performances than does SoundExchange's process. Sirius XM tracking data as to song plays captures and provides an accurate count of performances of the works of participating licensors. In contrast, SoundExchange's royalty statements have made it nearly impossible to discern how much a label is receiving on account of Sirius XM plays or whether those plays have been accurately captured.

33.    For these reasons, among others, the Sirius XM direct licenses provide an opportunity for record companies to do better economically than they would relying on distributions from SoundExchange. The otherwise economically irrational decisions of large numbers of record companies not even to consider the direct license proposal are, purely and simply, the result of Defendants' and their co-conspirators' concerted plan to thwart the success of these direct licenses for the reasons, and by the means, next described.

---

[1] The *pro rata* share is calculated by dividing the number of transmissions of the copyright owner's works in the given period by the total number of transmissions on the Sirius XM service during the period (whether or not directly licensed).

B.     **The Record Industry's Collusive Response to Sirius XM's**
       **Direct License Outreach**

34.     Sirius XM began its direct licensing initiative by reaching out to each of the four major recorded music companies which, among them, control the distribution of at least 70% of U.S. record sales and represent 55-65% of music plays on Sirius XM's services.  Given the enormous sums in royalties paid by Sirius XM, and the ability Sirius XM possesses to control the music it uses (providing the ability of a possibly label to increase the plays of its music through direct licenses), Sirius XM expected some interest on the part of the majors in exploring direct licensing.  What Sirius XM learned instead was that for any of the majors to have pursued direct license discussions would have been to break ranks with the industry collective, SoundExchange, on whose Board of Directors and Licensing Committee each sits.  Insofar as SoundExchange was and is actively seeking massive price increases from Sirius XM on the record industry's behalf, it became evident that the direct licenses were recognized by SoundExchange and the major recorded music companies to be a threat to achieving that objective.  This is the case since the royalty rates agreed to by individual record companies in direct dealings with Sirius XM would constitute powerful evidence of prevailing market rates in the pending 2013-2017 CRB proceeding -- a critically important aspect of such proceedings.  A significant number of direct licenses bearing royalty rates between 5% and 7% of Sirius XM's revenues would, Defendants and their collaborating record companies recognized, be devastating to their goal of attaining rates in the CRB proceeding as much as 300% above those levels.  This prospect needed to be prevented.

35.     Rebuffed by the major labels, Sirius XM turned its focus to the independent record companies, whose sound recordings, in combination, comprise some 35%-45% of total plays on Sirius XM.  Beginning in July, 2011, Sirius XM, through a licensing agent, over time

contacted more than 500 such entities with terms of a proposed license that encompassed grants of public performance and reproduction rights extending beyond those available under the statutory license. Sirius XM made plain its interest in discussing with such entities the prospect of enhanced airplay of the sound recordings in their catalogs – thus presenting the possibility of both higher royalties above prevailing distributions through the industry collective and the accompanying promotional benefits of exposure to Sirius XM's extensive subscriber base. Overwhelmingly, the independent record companies, like the majors, acting contrary to their individual economic self-interests, refused to license Sirius XM directly. This was no coincidence.

36.     The pattern of rejections, first by the majors, and next by large numbers of independent labels, has been the result of an unlawful course of conduct spearheaded by Defendants and other record industry organizations enlisted by them, involving collusion, misleading promises, threats and other illegal actions that resulted in large and small record companies refusing to even explore the potential benefits of direct licensing with Sirius XM. Such otherwise inexplicable conduct is symptomatic of unlawful conspiracies to boycott or refuse to deal. The economically superior deal is not even explored or is rejected without inquiry based on the unlawful expectation of monopoly rents flowing from the collective refusal to deal.

37.     Within days of Sirius XM's initial outreach to independent labels, SoundExchange, A2IM, and other co-conspirators, acting at the direction of their Boards and in concert with each other and other record industry organizations and individual record companies, implemented a plan to ensure that independent record companies rejected Sirius XM's licensing overtures. This plan took numerous forms, including mailings to their memberships, public statements released to the media and posted on their websites, Board level discussions, direct

pressure tactics placed on individual labels known to be considering Sirius XM's offer, and even overt efforts to cause one or more entities that actually signed a direct license to (in breach of its terms) repudiate it. The coordinated messaging was plain and unequivocal: *direct licensing is harmful to the Defendants' scheme to establish and maintain supra-competitive royalty rates. Hold the line and don't sign up.*

38.     Defendant A2IM launched the first missive directed to independent record companies urging them to act collectively in a manner contrary to their individual business interests by exhorting them to refuse to deal with Sirius XM through direct licensing. In an August 9, 2011 posting on its website entitled "Statutory Rates Versus Direct Licenses for Digital Music Streaming," A2IM President Rich Bengloff, who sits on Defendant SoundExchange's Board of Directors along with executives from each major label, several independent record companies, as well as representatives of RIAA, claimed that statutory licenses secured via SoundExchange are "good for the independent music label community," in contrast to direct licenses, "where independents have received less than equitable rates." Mr. Bengloff went on to assert: "The authority of SoundExchange to aggressively pursue the best possible statutory rates and handle all of the administration, including processing and auditing, results in having a **central group** to protect Indie rights as the statutory rate is working and Indie labels are benefiting from having this **central voice**." He further communicated to A2IM's hundreds of member companies that SoundExchange would be seeking rates in excess of 8% of revenue during the forthcoming CRB proceeding, a not-so-subtle signal to his members not to accept anything lower as a direct license royalty.

39.     Just two days later, on August 11, 2011, the next industry response issued, this in the form of a SoundExchange "Statement on Satellite Radio Royalty Proceedings," which was

also posted to its website. The statement falsely asserted that in the 2006 CRB proceeding,
"[t]he Judges actually concluded that the appropriate 'market rate' was 13%," and only dropped
that rate to current levels based on "Sirius's and XM's precarious financial positions." This
statement was knowingly false because SoundExchange knew that these very same assertions
had been unequivocally rejected by the Court of Appeals for the District of Columbia Circuit
when SoundExchange appealed from the Copyright Royalty Judges' ruling. *See*
*SoundExchange, Inc. v. Librarian of Congress*, 571 F.3d 1220, 1224 (D.C. Cir. 2009) ("This
argument need not occupy us long as it both mischaracterizes the agency's decision and ignores
relevant precedent."). The misrepresentation was clearly intended to create the misimpression
that, if only the record industry held firm against Sirius XM's direct license offers, uniform,
significantly higher royalties assuredly would be forthcoming in the CRB proceeding being
coordinated by SoundExchange.

40.     Lest this takeaway be lost on the industry, the SoundExchange statement went on
to deliver its message explicitly – and in bold type: **"We . . . are planning to seek a substantial
increase in the statutory rate. In other words, we plan to seek rates well in excess of the
2012 rate of 8%."** It continued by assuring the industry that it "should expect to see a
significantly increased statutory rate." Hammering home the importance of not breaking ranks,
the statement concluded by pointedly observing the importance for rate-setting that individual
marketplace agreements entered into by record labels would have in the CRB proceeding.

41.     The same day, the Future of Music Coalition ("FMC"), a national organization
representing musicians and other record industry interests, released a statement criticizing the
Sirius XM direct licensing initiative. In that statement, FMC referred to Sirius XM's direct

licensing efforts as a "scheme" that would be a "dangerous thing for performing artists." FMC also stated that direct licensing could be harmful to labels in the long run.

42.     On October 27, 2011, a coordinated attack on the direct license program was launched, orchestrated by Defendant SoundExchange and other record industry trade associations. On that day, SoundExchange, the National Academy of Recording Arts and Sciences ("NARAS" or "The Recording Academy"), the American Federation of Television and Radio Artists ("AFRTA"), and the American Federation of Musicians ("AFM") all reached out to their membership with communications designed to achieve a collective refusal to deal with Sirius XM. Once again, these statements were replete with innuendo and factual misstatements intended to misinform their intended audiences.

43.     For its part, SoundExchange, despite having been less than happy with the result in the 2006 CRB proceeding (and having appealed its outcome), touted its "success" in that proceeding in obtaining "a 300 percent increase in the rate paid by Sirius XM." It reiterated the canard that "the current royalty rates are artificially low" and promised that it would be "seeking a substantial increase in the next term."

44.     The Recording Academy, a national nonprofit organization, through a letter from its president Neil Portnow, invited its recording artists into the cartel, imploring them to "**call your label today and request that it not direct license … recordings.**" Turning to those of its members who own or manage an independent label, Mr. Portnow bluntly asserted that "**it is in your interest to refrain from direct licensing.**" Mr. Portnow went on to state that Sirius XM's efforts "will likely result in substantially reduced payments to artists and producers, a lowering of the value of performance royalties, and unnecessary conflict between artists and their labels" and exhorted member artists to act against their economic interests by resisting agreement to the

"positive terms" offered by Sirius XM.   Mr. Portnow included a link directing readers to Defendant A2IM's August 9, 2011 statement.

45.     In the third of the day's coordinated statements, AFTRA (a national union representing performers including singers and recording artists), in a joint statement with AFM (an international union representing musicians), portrayed Sirius XM as "seeking to … lower the rates for music on the backs of artists and musicians," labeling Sirius XM's direct licensing efforts as "blatantly anti-artist and anti-musician." The statement went on to make misleading assertions as to the likely impact on artists of Sirius XM making direct license payments directly to participating record labels.

46.     On the very next day, FMC released a statement noting that "the artist community – including AFTRA, AFM, The Recording Academy, A2IM, and SoundExchange – has been broadcasting the message to their members about the negative consequences of direct licensing deals for digital performance royalties.  **We applaud our artist colleagues for urging their members signed to indie labels (or self released artists) to not accept these direct licensing deals.**"

47.     The combined and coordinated messaging from SoundExchange, A2IM, and other record industry trade associations could not be plainer:  DO NOT sign direct licenses with Sirius XM; to do so would undermine SoundExchange's efforts for record companies to ratchet rates up well beyond existing levels.  This invitation by Defendants and others to broaden and deepen a boycott of Sirius XM to which members of their Boards had already agreed was accepted by numerous other record companies.

C.    **Defendants' Success in Bringing About a Concerted Boycott of Sirius XM's Direct Licensing Initiative**

48.    The full extent of Defendants' conspiratorial acts, many of which will have occurred in private communications and behind closed doors, is not presently known.  But it is plain that the Defendants did not mount such public, and economically significant, actions without the knowledge and consent of their Boards of Directors.   Boards that are composed of direct record industry competitors, including the four majors.  Sirius XM's importance to the music industry, and the financial and promotional benefits it affords that industry, would naturally be expected to generate potential interest to individual record companies approached with the direct license offer.  Numerous record companies' determinations instead to slam the door on discussions is explicable only by a collective refusal to deal designed to achieve prices above those that would be established in a competitive market.  This reality is only confirmed by the additional evidence of collusive conduct already known to Sirius XM.

49.    For example, Sirius XM's direct license outreach to independent label Bandit Records was short-circuited when a representative of Bandit Records told Sirius XM that **"[w]e're members of A2IM and Merlin.  I think that prevents a direct license."**  Upon information and belief, one or both Defendants communicated with Bandit Records (or through its representative Merlin Network[2]) and pressured them to refuse a direct license.

50.    Sirius XM's effort to engage in direct license discussions with independent label UnitedInterests was similarly derailed when, on August 30, 2011, a representative of UnitedInterests wrote: "I heard that XM was making these requests.  I will look at the license, **but will also confer with A2IM and other indies.**"  Upon information and belief,

---

[2] Merlin Network, a global rights agency representing independent music companies that touts itself as the "fifth major," has rebuffed efforts by Sirius XM to discuss direct licensing for the various independent labels it represents.  Rich Bengloff of A2IM is on the Board of Merlin Network.

UnitedInterests pursued those discussions and thereafter agreed with A2IM and/or other record companies not to enter into a direct license.

51.     Sirius XM's approach to independent label CA Management was stopped in its tracks when, on October 27, 2011, a representative of CA Management told Sirius XM that he was "getting mixed reviews about the best way to handle" the direct license offer.  Several weeks later, on November 15, 2011, he told Sirius XM that "**the RIAA has asked everyone to hold off**."  CA Management never entered into a direct license with Sirius XM because, upon information and belief, after CA Management communicated with RIAA, it agreed to participate in the industry boycott.

52.     Sirius XM's direct license discussions with independent label Bar-None foundered after, on August 20, 2011, one of the label's representatives informed Sirius XM that "**A2IM is opposed to this I believe.**"  Upon information and belief, Bar-None declined to pursue discussions with Sirius XM as part of an agreement with A2IM and perhaps other labels collectively to reject the Sirius XM direct license.

53.     The majors' determination to boycott Sirius XM has extended to agreements with the independent labels they distribute.  For example, on November 17, 2011, a representative of Fortress Marketing gave the following explanation for why it was not going to sign a direct license:  "[W]e are distributed by Universal [a major label].  It is my understanding that **they are advising against signing directly with SiriusXM in this matter**."

54.     Defendants' unlawful efforts have also extended to extracting agreements from labels that have already signed direct licenses to attempt to back out of them.  By way of example, on November 28, 2011, Sirius XM entered into a direct license with Paracadute, TMB Productions, Michael Doughty, and Michael Viola.  On February 9, 2012, Paracadute and TMB

Productions requested that they be released from the deal. Surprised by this request, Sirius XM's agent asked Darren Paltrowitz, the person with whom they had negotiated the deal, for an explanation. Mr. Paltrowitz's response was an e-mail with talking points strikingly similar to the Defendants' press releases, which Mr. Paltrowitz indicated were supplied by the bands' business manager. That business manager is Perry Resnick, an artist manager with RZO LLC, and a long-time member of the SoundExchange Board. After further discussions, on February 22, 2012, Mr. Paltrowitz wrote that he "relayed [Sirius XM's] feedback] to RZO, and they -- **per conversations with A2IM and other folks beyond SoundExchange** -- stand their ground about wanting us to opt out" of the direct license. That same day, Mr. Paltrowitz cut and pasted an e-mail he received from Mr. Resinick that stated: "I know for a fact that Rich Bengloff, the head of A2IM … is against this. **Rich and I have had this exact conversation, and are both in agreement that SoundExchange is the better way to go.**"

55.     Other artists and music labels have not entered into a Sirius XM direct license for fear that Defendants would disfavor them financially, among other ways. An artist or music label who enters into a Sirius XM direct license will still need to continue to work with SoundExchange to secure royalties for performances by other licensed companies. These artists and music labels feared that if they agreed to a direct license with Sirius XM, SoundExchange would withhold or otherwise diminish the royalties they are otherwise due from SoundExchange for performances of their music by companies other than Sirius XM. In addition, these artists and music labels fear being viewed as a pariah in a close-knit music industry and boycotted from board membership or other leadership positions in the industry.

56.     In furtherance of Defendants' unlawful plan, SoundExchange has gone so far as to misuse the privilege accorded it to represent the record industry in statutory license

proceedings by seeking therein a modification to an existing license term that ensures the economic viability of direct licensing.  In the ongoing CRB proceeding, in addition to seeking rates between 50% and 150% higher than the prevailing 2012 percentage-of-revenue level, SoundExchange has asked for a modification of the existing provision that allows Sirius XM to carve out (deduct as a credit) from its royalty obligations to SoundExchange payments attributable to its obtaining equivalent rights under direct licensing arrangements. SoundExchange proposes instead that the rates set by the Copyright Royalty Judges be applied to Sirius XM's gross revenues with no deductions of any kind, including for programming that is directly licensed.  The plain intent of this proposal (which is directly contrary to the preference for competitive direct licensing reflected in Section 114) is to eliminate any remaining prospect of Sirius XM benefiting from competitive licensing of sound recordings by penalizing it with double payments for the same rights were it to do so.  If any record labels slip through the conspiratorial web spun by Defendants, as some have in fact done, this cynical license proposal by SoundExchange is designed to guarantee that Sirius XM will – literally – pay dearly for that.

57.    The foregoing recitation undoubtedly represents but the tip of the evidentiary iceberg reflecting Defendants' boardroom level and other direct communications spawning and implementing Defendants' and complicit record companies' unlawful conspiracy to prevent competitive licensing of sound recording performance rights available under Section 114 of the Copyright Act.

58.    In the face of the foregoing unlawful course of conduct, it is nothing short of remarkable that Sirius XM has achieved  nearly 80 signed direct licenses to date.  But for the unlawful actions of the Defendants, there is every reason to believe it would have attained far more.

59.     Defendants' and their co-conspirators' agreements to boycott and tortiously interfere with Sirius XM's direct licenses are not saved by the very limited antitrust exemption found in Section 114(e) of the Copyright Act.  That section allows the Defendants to act collectively in negotiations and before the CRB through SoundExchange *as an alternative to direct licensing such as the program undertaken by Sirius XM.*  Nothing in Section 114(e) authorizes the Defendants to interfere with or cut off that alternative, market-based method of setting rates.  In fact, Defendants have acted beyond the scope of Section 114(e) in several ways.  SoundExchange is authorized to act solely as a *non-exclusive* licensing agent for statutory licenses, and even those activities are to be confined to negotiations over statutory licenses.  The plainly intended effect of the unlawful agreements complained of herein is to convert the record industry's circumscribed *non-exclusive* ability to facilitate implementation of the permitted statutory license into an exclusive grant to SoundExchange to negotiate and, as necessary, litigate over the value of statutory licenses.  Further, insofar as the direct licenses implicate copyright rights that go beyond those covered by the statutory license and SoundExchange's limited statutory role, there is no conceivable justification under Section 114(e) for collective action directed against Sirius XM's license initiative – let alone a concerted boycott of those licenses.

60.     That, even in the face of Defendants' collusive agreements and behavior, Sirius XM has been able to come to agreement with some recording companies which, collectively, are representative of the quality and genres of music used by Sirius XM, demonstrates that these direct licenses are economically beneficial to recording companies.  Absent the unlawful conduct alleged herein, there is no reason that all the major recording companies and the vast majority of

independent recording companies offered direct licenses would act against their own economic self interest by rejecting, in many cases completely out of hand, Sirius XM's licensing efforts.

## VIII.   RELEVANT MARKET, MARKET SHARE AND MARKET POWER

61.     The relevant antitrust product market in this case is the performance rights to sound recordings available under Section 114 of the Copyright Act (the "Sound Recording Performance Rights Market"). Because Sirius XM's business involves the public performance of sound recordings to subscribers, there are no reasonably available substitutes for this product.

62.     Because Defendants' anticompetitive practices have effectively eliminated direct licensing as a potential alternative for all potential rights users, SoundExchange's share of the Sound Recording Performance Rights Market is at or about 100 percent. By eliminating direct licensing, SoundExchange, contrary to Congress' intent, maintains monopoly power achieved not by business acumen, objective historical circumstances, or superior products, but instead by the unlawful practices described herein.

63.     The relevant geographic market is the United States and its territories.

## IX.     ANTICOMPETITIVE EFFECTS OF DEFENDANTS' PRACTICES

64.     The purpose and effect of Defendants' conduct is to eliminate actual and potential competition between and among individual record companies to have their works performed on Sirius XM (and other similarly situated potential licensees), which direct licensing with Sirius XM would have fostered. The goal of Defendants' conduct is to eliminate competition that would have existed by Sirius XM's direct licensing initiative. This conduct is antithetical to both the antitrust laws and Section 114 of the Copyright Act, each of which contemplate an unimpaired direct licensing marketplace as an alternative to the collective license authority reposed in SoundExchange. In derogation of the Congressionally mandated non-exclusive statutory licensing framework, Defendants' scheme is by threat and coercion to anoint

SoundExchange as the ultimate gatekeeper – the sole licensor in the Sound Recording Performance Rights Market.  On information and belief, the impact of Defendants' anti-competitive conduct has similarly chilled the ability of other potential licensees to obtain direct licenses in the Sound Recording Performance Rights Market.

65.     Defendants by their conduct also have unlawfully expanded the scope of collective activities permitted under Section 114 of the Copyright Act.  The effect has been to deprive Sirius XM of access to or increase the cost of copyright rights that would enable Sirius XM to expand its product offerings and services to consumers in order to compete with newer technology.  Consequently, harm to consumers is a likely by-product of Defendants' scheme.

66.     As a result of Defendants' anticompetitive conduct, it is virtually impossible for Sirius XM to obtain through direct licensing the necessary rights to avoid reliance on the SoundExchange administered, blanket statutory license (let alone exploit rights that, by law, can only be granted by individual record labels).  To date Sirius XM has been injured in its ability to consummate direct licenses and to offer programming and service enhancements that require direct license grants from rights holders, by SoundExchange's market power and effort to extract a supracompetitively priced blanket license.  In the absence of the relief sought in this action, this harm will only continue.  It is likely that similar anticompetitive harm will befall other rights users who are unable to secure direct licenses to rights in the SoundExchange repertory.

67.     But for the Defendants' anticompetitive conduct and tortious interference, Sirius XM, and presumably others similarly situated, would have signed many more direct licenses, and would be able to offer subscribers a much wider repertory of sound recordings in its service enhancements that are not covered by the statutory license.  As a result, Sirius XM, and presumably others similarly situated, have been hindered in their ability to compete in the

marketplace. Defendants' unlawful behavior has made the delivery of sound recordings to users less innovative and more expensive.

## X.    CLAIMS FOR RELIEF

**FIRST CLAIM FOR RELIEF
(AGAINST ALL DEFENDANTS):
*PER SE* UNLAWFUL AGREEMENT AND
GROUP BOYCOTT IN RESTRAINT OF TRADE
(SHERMAN ACT, SECTION 1, 15 U.S.C. § 1)**

68.    Sirius XM incorporates and realleges each and every allegation set forth in Paragraphs 1 through 67 as though repeated and realleged here in full.

69.    Defendants have continuously engaged in an unlawful contract, combination or conspiracy to unreasonably restrain interstate trade and commerce in violation of Section 1 of the Sherman Act, 15 U.S.C. § 1.

70.    The contract, combination or conspiracy has consisted of continuing agreements, and a group boycott of direct licensing with Sirius XM, in order to fix, peg, raise, stabilize, effect and tamper with market prices for licenses for copyrighted sound recordings in the Sound Recording Performance Rights Market in violation of Section 1 of the Sherman Act.

71.    Defendants' foregoing actions constitute *per se* unlawful price fixing agreements and a *per se* unlawful group boycott.

72.    Defendants threaten to, and will, continue the aforesaid violations of Section 1 of the Sherman Act, causing injury and damage to competition, as well as to Sirius XM, other licensees, individual record labels, and the listening public, unless the injunctive and other relief sought herein is granted.

## SECOND CLAIM FOR RELIEF
## (AGAINST ALL DEFENDANTS):
## UNLAWFUL AGREEMENT IN RESTRAINT OF TRADE
## UNDER THE *RULE OF REASON*
## (SHERMAN ACT, SECTION 1, 15 U.S.C. § 1)

73.     Sirius XM incorporates and realleges each and every allegation set forth in Paragraphs 1 through 72 as though repeated and realleged here in full.

74.     Defendants have continuously engaged in an unlawful contract, combination or conspiracy unreasonably to restrain interstate trade and commerce in violation of Section 1 of the Sherman Act, 15 U.S.C. § 1.

75.     The contract, combination or conspiracy has consisted of continuing agreements, and a group boycott of Sirius XM's direct license, in order to fix, peg, raise, stabilize, effect and tamper with market prices for licenses for copyrighted sound recordings in the Sound Recording Performance Rights Market in violation of Section 1 of the Sherman Act.

76.     The aforesaid Sherman Act Section 1 violations have had the following anticompetitive effects in the Sound Recording Performance Rights Market:

1) Price competition between and among SoundExchange rights holders in the licensing of performance rights in copyrighted sound recordings has been eliminated or suppressed;

2) Anticompetitive price structures for sound recording performance rights have been established and maintained;

3) Sirius XM, and others similarly situated, have been deprived of the benefits of free competition in the determination of prices, royalty rates and fees;

4) Sirius XM, and others similarly situated, have been forced to pay excessive license royalties they otherwise would not have paid in the absence of Defendants' anticompetitive conduct;

5) Actual and potential competition in licensing public performance rights in the sound recordings of SoundExchange's affiliated artists and copyright owners have been adversely affected, excluded and prevented; and

> 6)   Competition in the form of alternatives to the SoundExchange blanket license has been adversely affected, excluded and prevented.

77.   Defendants' conduct offers no procompetitive benefits and, as such, constitutes an unreasonable restraint of trade.

78.   Defendants threaten to, and will, continue the aforesaid violations of Section 1 of the Sherman Act, causing injury and damage to competition, as well as to Sirius XM, other licensees, individual record labels, and the listening public, unless the injunctive and other relief sought herein is granted.

### THIRD CLAIM FOR RELIEF
### (AGAINST SOUNDEXCHANGE ONLY):
### MONOPOLIZATION
### (SOUND RECORDING PERFORMANCE RIGHTS MARKET)
### (SHERMAN ACT, SECTION 2, 15 U.S.C. § 2)

79.   Sirius XM incorporates and realleges each and every allegation set forth in Paragraphs 1 through 78 as though repeated and realleged here in full.

80.   SoundExchange possesses monopoly power in the Sound Recording Performance Rights Market.

81.   Defendants have a specific intent to monopolize the Sound Recording Performance Rights Market, in violation of Section 2 of the Sherman Act, 15 U.S.C. § 2.

82.   SoundExchange has unlawfully obtained and maintained power over the price of the license fees and the power to exclude license competition in the Sound Recording Performance Rights Market.

83.   SoundExchange has willfully maintained monopoly power in the Sound Recording Performance Rights Market through numerous overt and exclusionary acts.  First, SoundExchange has prevented affiliated record labels from entering into direct license agreements with Sirius XM.  Second, SoundExchange has exceeded the scope of its limited

statutory authority.  Third, SoundExchange has engaged in copyright misuse by forcing Sirius

XM to take the statutory license as the only license option available under the threat of massive

statutory damages for infringement under the Copyright Act.  Fourth, SoundExchange has issued

false and misleading statements designed to prevent record labels from dealing with Sirius XM,

when such dealing is in their individual interest.  Fifth, SoundExchange has interfered with

contracts between record companies and Sirius XM to further its unlawful monopolization of

sound recording licensing.  This conduct, separately and collectively, as alleged throughout this

Complaint, has violated and continues to violate Section 2 of the Sherman Act, 15 U.S.C. § 2.

84.     Such violations and the effects thereof are continuing and will continue, and cause

injury to Sirius XM, other licensees, individual record labels, and the listening public unless the

injunctive and other relief sought herein is granted.

**FOURTH CLAIM FOR RELIEF**
**(AGAINST ALL DEFENDANTS):**
**CONSPIRACY TO MONOPOLIZE**
**(SHERMAN ACT, SECTION 2, 15 U.S.C. § 2)**

85.     Sirius XM incorporates and realleges each and every allegation set forth in

Paragraphs 1 through 84 as though repeated and realleged here in full.

86.     SoundExchange possesses monopoly power in the Sound Recording Performance

Rights Market.

87.     Defendants have continuously engaged in an unlawful contract, combination or

conspiracy to prevent Sirius XM from entering into direct licenses with copyright owners.

88.     Defendants have a specific intent to monopolize the Sound Recording

Performance Rights Market, in violation of Section 2 of the Sherman Act, 15 U.S.C. § 2.

89.     Defendants have conspired to monopolize the Sound Recording Performance

Rights Market.  By virtue of the exclusionary and anticompetitive actions of Defendants, as well

as their agents and co-conspirators, SoundExchange has exceeded the scope of its limited

statutory authority in order to maintain and extend its monopoly power.

90.     Such violations and the effects thereof are continuing and will continue, and cause

injury to Sirius XM, other licensees, individual record labels, and the listening public unless the

injunctive and other relief sought herein is granted.

### FIFTH CLAIM FOR RELIEF
### (AGAINST ALL DEFENDANTS:  DAMAGES)
### TORTIOUS INTERFERENCE WITH PROSPECTIVE ECONOMIC ADVANTAGE

91.     Sirius XM incorporates and realleges each and every allegation set forth in

Paragraphs 1 through 90 as though repeated and realleged here in full.

92.     Sirius XM has a prospective economic relationship with individual record labels,

which can and do negotiate direct licenses instead of using the statutory licenses administered by

SoundExchange.

93.     Defendants were aware of Sirius XM's prospective economic relationship with

individual record labels.

94.     Defendants have intentionally and improperly interfered with Sirius XM's

prospective business relations without justification by monopolizing the Sound Recording

Performance Rights Market and conspiring to stifle potential competition to the blanket license

under 17 U.S.C. § 114 in violation of federal antitrust laws in order to drive away potential direct

licensors and artificially inflate participation in the statutory license administered by

SoundExchange.

95.     Defendants have also intentionally and improperly interfered with Sirius XM's

prospective business relations without justification by making misrepresentations in connection

with Sirius XM's direct licensing initiative in order to drive away potential direct licensors and artificially inflate participation in the statutory license administered by SoundExchange.

96.     Defendants have also encouraged individual record labels to act in breach of contracts with Sirius XM to further their tortious attempts to prevent arm's-length agreements between Sirius XM and the record labels.

97.     Absent these unjustified and intentional acts of interference with Sirius XM's prospective business relations through violations of the Sherman Act and false and misleading statements, Sirius XM would have entered into additional direct licensing agreements.

98.     Defendants' interference with Sirius XM's ability to pursue and enter into business relations in the form of direct licensing agreements with individual record labels has caused, and continues to cause, injury and damage to Sirius XM in an amount to be determined at trial.

### SIXTH CLAIM FOR RELIEF
### (AGAINST ALL DEFENDANTS:  INJUNCTIVE RELIEF)
### TORTIOUS INTERFERENCE WITH PROSPECTIVE ECONOMIC ADVANTAGE

99.     Sirius XM incorporates and realleges each and every allegation set forth in Paragraphs 1 through 98 as though repeated and realleged here in full.

100.    If, and to the extent the damages sought in the fifth cause of action are not sufficient to provide a full and complete remedy to Sirius XM, Sirius XM is entitled to injunctive relief as well.

101.    Defendants' continued tortious interference will cause harm to Sirius XM, third parties, and the public, that may not be fully compensable by monetary damages, in which event Plaintiff has no adequate remedy at law.

## XI. PRAYER FOR RELIEF

WHEREFORE, Plaintiff prays for relief as follows:

A.  The Court adjudge and decree that:

1)  Defendants have contracted, combined and conspired to restrain interstate trade and commerce in the Sound Recording Performance Rights Market in violation of Section 1 of the Sherman Act, 15 U.S.C. § 1;

2)  Defendant SoundExchange has acquired, willfully maintained, and abused monopoly power through exclusionary acts, in violation of Section 2 of the Sherman Act, 15 U.S.C. § 2, in the Sound Recording Performance Rights Market;

3)  Defendants have conspired for SoundExchange to acquire, willfully maintain, and abuse monopoly power through exclusionary acts, in violation of Section 2 of the Sherman Act, 15 U.S.C. § 2, in the Sound Recording Performance Rights Market;

4)  By violating the antitrust laws as alleged herein, Defendants have misused the copyrights licensed by SoundExchange for anticompetitive and unlawful purposes, the adverse effects of such misuse are continuing, and such copyrights should be declared unenforceable until such time as adequate relief is entered to remedy the violations alleged, and the effects of the violations are dissipated;

5)  Defendants, as well as their successors, assigns, parents, subsidiaries, affiliates and transferees, and their respective officers, directors, agents and employees, and all other persons acting or claiming to act on behalf of Defendants, or in concert with them, be permanently enjoined and restrained from, directly or indirectly continuing to impose the unlawful price-fixing agreements and other unlawful conduct detailed in this Complaint, and from engaging in any other combination, conspiracy, contract, agreement, understanding or concert of action having a similar purpose or effect and from adopting or following any practice, plan, program or device having a similar purpose or effect;

6)  Defendants, as well as their successors, assigns, parents, subsidiaries, affiliates and transferees, and their respective officers, directors, agents and employees, and all other persons acting or claiming to act on behalf of Defendants, or in concert with them, be permanently enjoined and restrained from instituting, or threatening to institute, copyright infringement actions directed against the use by Sirius XM, of copyrighted sound recordings licensed by SoundExchange, until the effects of the anticompetitive conduct described herein have been dissipated.

B.      The Court order Defendants to pay Plaintiff threefold the amount of damages the Court determines that each has sustained by reason of the violations of the Sherman Act herein described;

C.      The Court enjoin Defendants from wrongfully interfering with Plaintiff's ability to negotiate and enter into prospective direct licensing contracts;

D.      The Court order SoundExchange to be dissolved and unwound on an orderly basis or, alternatively, order that an independent monitor to be appointed to oversee SoundExchange's compliance with the antitrust laws, at SoundExchange's expense, for a period of ten years or other amount of time to be determined by the Court;

E.      The Court award Plaintiff damages sustained as a result of Defendants' interference with it entering into prospective direct licensing contracts;

F.      The Court award Plaintiff the costs and disbursements of this action, including attorneys' fees, and pre-judgment and post-judgment interest as permitted by law;

G.      The Court grant such other relief as may be necessary or appropriate to dissipate fully the effects of Defendants' unlawful activities as alleged herein, and to permit and restore free and open competitive conditions in the marketplace; and

H.      The Court grant such other and further relief as may be necessary and appropriate.

## **DEMAND FOR JURY**

Pursuant to Rule 38 of the Federal Rules of Civil Procedure, Plaintiff demands a trial by jury.

Dated:  March 27, 2012                    Respectfully submitted,


                                          By: _____
                                                    R. BRUCE RICH

                                          R. BRUCE RICH
                                          STEVEN A. REISS
                                          BRUCE COLBATH
                                          THEODORE E. TSEKERIDES
                                          WEIL, GOTSHAL & MANGES LLP
                                          767 Fifth Avenue
                                          New York, New York 10153
                                          (212) 310-8000

                                          *Counsel for Plaintiff*